Filed 8/18/25  In re D.H. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

---

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

---

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re D.H., a Person Coming Under the Juvenile Court Law. | C102928 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br>            Plaintiff and Respondent,<br><br>    v.<br><br>D.H. et al.,<br>            Defendants and Appellants. | (Super. Ct. No. STK-JD-DP-2023-0000483) |

Appellants S.R. (mother) and D.H. III (father) (collectively, parents) appeal[1] from the juvenile court's orders terminating parental rights and freeing D.H. IV (minor) for adoption.  (Welf. & Inst. Code,[2] §§ 366.26, 395.)  Parents contend:  (1) the juvenile court

---

[1]    Parents filed separate notices of appeal and briefs but join in each other's arguments.  (Cal. Rules of Court, rule 8.200(a)(5).)  Further undesignated rule references are to the California Rules of Court.

[2]    Further undesignated section references are to the Welfare and Institutions Code.

1

erred in denying the petition of his paternal great-great-aunt, Betty C.,[3] for placement (§§ 361.3, 388); and (2) this court should conditionally reverse the orders for failure to comply with the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1902 et seq.).

We conclude that parents lack standing to appeal the juvenile court's decision not to place the minor with Betty C. We conditionally reverse the juvenile court's dispositional orders and finding that ICWA does not apply and will remand to the juvenile court for the limited purpose of further compliance with the inquiry and notice requirements of ICWA and related law.

FACTUAL AND PROCEDURAL BACKGROUND

On December 21, 2023, the San Joaquin County Human Services Agency (the Agency or Agency) filed a section 300 petition, alleging the minor, born in December 2023, came within section 300, subdivision (b)(1). The petition alleged mother had a history of substance abuse and had tested positive for amphetamines at prenatal appointments and reported using methamphetamine throughout her pregnancy. Mother had seven prior cases involving four half-siblings of the minor in which she failed to reunify, and parents had an open case in Nevada for minor's sibling, Da. H., who was placed with a paternal great-great-aunt in Nevada. Father also had a history of substance abuse and had failed or refused to rehabilitate. Additionally, the parents lacked a safe, stable residence.

As recounted in the petition, a social worker interviewed the minor's parents in the hospital. Mother reported no Native American ancestry, but father reported his grandmother was a registered member of an unknown tribe in Oklahoma. Both mother

---

[3] To protect their privacy, we refer to the witnesses by their first name and last initial or initials. (Rule 8.90(b)(10) & (11).) Betty C., is referred to in the record numerous times as father's "great-aunt." In her testimony at the child placement hearing in November 2024, Betty C. clarified that she is father's great-great-aunt. We will refer to father's relative as Betty C. or his great-great-aunt.

2

and father completed Parent Notification of Indian Status forms ICWA-020. Mother checked a box disclaiming any Indian tribe connection, but father checked the box that the minor is or may be a member of, or eligible for membership in, a federally recognized Indian tribe. On the line for the name of the tribe, father wrote: "Unknown in Oklahoma father's grandmother." The Agency concluded there was a claim of Native American heritage, but not sufficient information for " 'reason to know' " the minor is ICWA eligible. The Agency stated that notice would be provided to all federally recognized Indian tribes and the Bureau of Indian Affairs (BIA).

In the interview, the parents stated that the minor's sibling, Da. H., was two years old as of December 21, 2023, and lived with a parental great-great-aunt in Las Vegas, Nevada. Mother initially claimed she lived at a residence in Stockton but later admitted she was homeless. Father denied he was homeless, but the social worker was unable to verify father's claim that he lived with his adult daughter, Tiffany L. The social worker met with the minor's assigned nurse at the hospital, who reported speaking by telephone with Betty C. According to Betty C., the parents were homeless and lived in a tent along the railroad tracks in Stockton. Parents asked for Tiffany L. to be assessed for emergency relative placement, and, if the minor could not be placed with Tiffany L., they requested an Interstate Compact on Placement of Children (ICPC) assessment for Betty C. in Las Vegas, Nevada.[4] An assessment of Tiffany L. determined that she had a disqualifying criminal history.

---

[4] The ICPC (Fam. Code, § 7900 et seq.) governs conditions for out-of-state placement of dependent children. (*In re Z.K.* (2011) 201 Cal.App.4th 51, 66.) "Among other things, the ICPC provides that a dependent child subject to the compact's provisions 'shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.' (Fam. Code, § 7901, art. 3, subd. (d).)" (*Id.* at p. 58, fn. 4.)

The next day, the social worker spoke with Betty C. Betty C. reported she had five other children in her home in addition to Da. H. She received support from her husband, Ralph C., an attorney from Stockton, in caring for the minor children in her home.

On December 29, 2023, Betty C. and Ralph C. requested placement of the minor with them. They stated they had placement of the minor's sibling, Da. H., and would like to keep the children together.

On January 4, 2024, the juvenile court authorized the Agency to start the ICPC process but stated that the minor should not yet be moved. At the hearing, the juvenile court also questioned both mother and father regarding possible Native American heritage. Mother stated she had no Native American heritage, and father said, "I don't know."

On January 12, 2024, the Agency filed a jurisdictional and disposition report recommending bypass of reunification services for mother and father under sections 361.5, subdivisions (b)(10), (11), and (12). The report repeated father's claim that his grandmother was a registered member of an unknown tribe in Oklahoma. Father was interviewed regarding his family background. He stated his father died 15 to 20 years ago, and he had not talked to his mother in approximately nine years. Father had four living siblings, twins S.H. and Sa. H. in Oakland, California, and M. H. and A. R. The Agency sent placement letters to a number of mother's potential family members, as well as Sa. H., father's half-sibling Dal. H., and father's current wife V. H. The Agency noted Betty C. and Ralph C.'s request for placement of the minor but observed that the minor's relationship with Da. H. was "nonexistent" as she was in foster care in another state and had never met him. The Agency acknowledged it was appropriate to develop and maintain the sibling relationship, but the ICPC process needed to be completed.

On January 30, 2024, the minor was made a dependent child of the juvenile court. The court authorized the Agency to make an appropriate placement of the minor.

On February 1, 2024, the Agency served a Notice of Child Custody Proceeding for Indian Child (ICWA-030) on the BIA. No tribe was specified. The notice provided the names and location information for mother's and father's parents, grandparents, and great-grandparents, including the current city of residence (Phoenix, Arizona) for father's living grandmother.

On March 12, 2024, a transmittal memo from the Agency ICPC to Nevada ICPC noted that Betty C. and Ralph C. had changed their licensing foster agency to Apple Grove Family Services in Las Vegas, Nevada, and were in the process of becoming licensed. On March 20, 2024, Nevada ICPC provided the Agency ICPC with a preliminary report stating that Betty C. and Ralph C.'s background checks were incomplete, and licensing was pending with Apple Grove, estimating a completion time of six to eight weeks for the ICPC process. Nevada ICPC stated: "This is NOT approval to place."

On March 26, 2024, the juvenile court found both father and mother bypassed for reunification services, sustained the petition, made the minor a dependent of the juvenile court, and awarded custody to the Agency for placement.

On April 2, 2024, the Agency filed a declaration regarding its efforts to identify the minor's Native American affiliation. The Agency stated that notices setting forth the parents' family information were sent to the BIA. The BIA responded that no tribe had been identified, and insufficient information was provided to determine tribal affiliation. The Agency stated that, based on this response, the BIA determined the minor was not an Indian child under ICWA.

On June 24, 2024, Anne Z. filed a request to be appointed de facto parent of the minor. Anne Z. stated that she had been responsible for the minor's day-to-day care since December 20, 2023.

On July 9, 2024, the Agency filed a status review report and case plan update recommending that parental rights of mother and father be terminated and the minor

freed for adoption. The Agency noted father's claim of Native American heritage but concluded there was insufficient information to conclude there was " 'reason to know' " the child was ICWA eligible. The Agency requested a finding that ICWA does not apply. Regarding placement, the Agency reported Betty C. advised that she was working with Apple Grove. Betty C. stated she has six beds and room for the minor and his sibling at her home, as five foster youth were leaving to return to their parents in the next two months.

On July 17, 2024, the Agency filed a section 366.26 report recommending a 90-day continuance to evaluate placement of the minor with Betty C. and Ralph C. The Agency noted the minor appeared to have adjusted well in the care of his current caregiver. The minor was a happy and healthy six-month-old boy who was developing age appropriately and thriving. The minor was placed in a stable and loving home and appeared attached and bonded with his caregiver. The Agency nonetheless planned to place the minor with Betty C. and Ralph C. in Las Vegas, Nevada, after the hearing and requested the juvenile court to order placement with them. An Agency social worker reported speaking to Betty C. and Ralph C. on July 15, 2024, regarding ICWA. Betty C. stated that there were no family members who had ICWA heritage.

On August 15, 2024, a Nevada ICPC social services specialist reported that an amendment was needed to the license of Betty C.'s home because there was currently only one adult in the home with six children, and the minor would bring the total number of children to seven placed in the home. Betty C. stated that the other children in her home would be reunited with their parents at the end of August 2024. Betty C., however, was not approved for placement of the minor over her capacity limit. Should she be approved for placement, the Agency would also need to approve a placement contract.

On August 20, 2024, Nevada ICPC informed the Agency that the minor was approved for placement with Betty C. and Ralph C. Nevada ICPC attached an amended license for Betty C. to operate a specialized foster home with Apple Grove as the foster

agency.  The amended license increased the number of beds allowed from six to seven, the age preference from 2 to 14 years to 0 to 14 years, and licensed relative placements for the minor, Da. H., and four half-siblings.

On the same day, the Agency filed an amended section 366.26 report changing its placement recommendation to recommend that the minor be placed with his current caregiver.  On September 19, 2024, the Agency notified Betty C. that her home had been assessed and approved as a potential placement for the minor, but after further assessment of the home and the minor's needs, he would not be placed in her home.  The Agency explained that the minor had been in the care of the current caregiver for eight months, receiving stability, security, and safety for his well-being.  The Agency concluded there was no need to move the minor, as his needs were being met by the current caregiver.

On September 23, 2024, the juvenile court (1) granted the de facto parent request and (2) found that the Agency made substantial and reasonable efforts to determine the minor's Native American affiliation and ICWA did not apply.  At the request of counsel for parents, the juvenile court set a hearing on placement for November 5, 2024.

On October 14, 2024, Betty C. filed a petition under section 388 to change the juvenile court's order placing the minor with his current caregiver and order placement in Betty C.'s home.

On November 5, 2024, the juvenile court conducted a combined section 366.26 and placement hearing at which Betty C., Ralph C., and an Agency social worker, Jennifer Cruz, testified.

Betty C. testified that, after mother called to tell her of the minor's birth, Betty C. spoke to a social worker at the hospital who asked if she was interested in taking the minor, and she said, yes.  When asked if she was able to care for the minor, Betty C. said she had been caring for the minor's sibling, Da. H., since she was a month old.  Betty C. was approved to have seven children in her home, and now only had Da. H. and a 15-year-old grandson.  Betty C. believed it was in the minor's best interest to be placed with

her in Nevada because he is a blood relative and should be raised with his sister. Betty C. testified that she was aware the minor has special needs, but all the children she cared for had special needs.[5]

Ralph C. testified that he had one case set for trial in January in Stockton but otherwise was retired. This case would require Ralph C. to come to Stockton for trial for two or three days before returning to Las Vegas. Ralph C. believed it was vitally important for a child's well-being to be raised with his biological family and his sister. Betty C. and Ralph C. had legal guardianship of the minor's sister and intended to adopt her and the minor.

Jennifer Cruz testified she was assigned to the case in April 2024. The previous social worker explained that after the ICPC process had been started, Betty C. changed from the county foster agency to Apple Grove, causing a delay. Cruz contacted Apple Grove, which explained there was one space for the minor. Cruz was waiting on a home study and to determine who was going to be the support for Betty C. Apple Grove sent Cruz a December 2023 home study by a Nevada county foster agency describing the home of Betty C. and Ralph C. in favorable terms, and listing the children residing in the home, including Da. H. In July 2024, Cruz wrote a section 366.26 report recommending placement with Betty C., stating that the Nevada county foster agency approved the placement on December 28, 2023. Cruz sent the December 2023 home study to counsel for the parties in July or August 2024 and relied on it in recommending in her July 2024 report that the minor be moved to Las Vegas.

In August 2024, a Nevada county foster agency sent an email stating there was no room for another child, and Jennifer Cruz wrote a new report recommending that the

---

[5]    A sonogram in the hospital revealed the minor was missing one kidney and would need to see a specialist. In her de facto parent motion, Anne Z. reported that the minor has fluid around the brain, which required trips to the emergency room and follow-ups with specialists.

minor remain with the current caregiver. Betty C. had seven children placed in her home, three with special needs, though she was only approved for five children. Later in August 2024, the Agency was informed that the ICPC had been approved, and there was room at Betty C.'s home for the minor.

Jennifer Cruz testified that the minor was placed with the current caregiver at birth and had been with this caregiver ever since. The current caregiver met the minor's needs by taking him to all his medical appointments. The minor was thriving in her care and bonded with her. The Agency had no concerns with the care the minor was receiving, and there was no reason to change the placement. Betty C.'s contact with the minor over his life span had been minimal, and she had no relationship with the minor.

On January 14, 2025, the juvenile court denied Betty C.'s request to change the placement order, finding the proposed change did not promote the best interests of the child. The court terminated the parental rights of mother and father and freed the minor for adoption.

Mother and father filed separate appeals.

DISCUSSION

I

*Relative Placement*

Mother contends that the juvenile court abused its discretion when it found that the relative placement preference under section 361.3 did not apply and denied Betty C.'s motion to change the placement order under section 388. Father joins in this contention. The Agency argues parents lack standing to raise a section 361.3 claim on appeal. The Agency alternatively argues that under sections 361.3 or 388, the juvenile court's decision is supported by substantial evidence. We agree that parents lack standing.

We begin with section 361.3. This statute " 'gives "preferential consideration" to a relative's request for placement, which means "that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3 subd. (c)(1).)'

9

[Citation.] 'When considering whether to place the child with a relative, the juvenile court must apply the [section 361.3] placement factors, and any other relevant factors, and exercise its independent judgment concerning the relative's request for placement.' " (*In re A.K.* (2017) 12 Cal.App.5th 492, 498 (*A.K.*).)

"Whether a person has standing to raise a particular issue on appeal depends upon whether the person's rights were injuriously affected by the judgment or order appealed from. [Citation.] A person does not have standing to urge errors on appeal that affect only the interests of others. [Citation.] Accordingly, a parent is precluded from raising issues on appeal which do not affect his or her own rights." (*A.K., supra,* 12 Cal.App.5th at p. 499.)

Section 361.3 "protects a relative's 'separate interest' in a relationship with the child. [Citation.] In contrast, a parent's interest in a dependency proceeding is in *reunifying* with the child." (*A.K., supra*, 12 Cal.App.5th at p. 499.) Thus, "a parent does not have standing to raise relative placement issues on appeal, where the parent's reunification services have been terminated. [Citation.] This is because decisions concerning placement of the child do not affect the parent's interest in reunification, where the parent is no longer able to reunify with the child." (*Ibid.*; *In re Jayden* (2014) 228 Cal.App.4th 1452, 1460 ["Once a parent's reunification services have been terminated, the parent has no standing to appeal relative placement preference issues"].)

Here, parents cannot establish that their rights and interests in reunification were injuriously affected by failure to place the minor with Betty C. and Ralph C. (*A.K., supra*, 12 Cal.App.5th at p. 499.) The juvenile court terminated the parents' reunification services months before it considered whether to grant Betty C.'s petition to change the order placing the minor with his current caregiver, Anne Z. Accordingly, parents lack standing to assert error under section 361.3.

Turning to section 388, in *In re K.C.* (2011) 52 Cal.4th 231 (*K.C.*), the California Supreme Court held that a father lacks standing to appeal the juvenile court's denial of

10

grandparents' motion under section 388 to modify a minor's existing placement by placing them in their home. (*K.C.* at pp. 234-235.) The high court observed that, although parents have an interest in their children's companionship, care, custody, and management, after reunification services are terminated or bypassed, the parent's interest in the care, custody and companionship of the child is no longer paramount and the focus shifts to the needs of the child for permanency and stability. (*Id.* at p. 236.) For this reason, "[a] parent's appeal from a judgment terminating parental rights confers standing to appeal an order concerning the dependent child's placement only if the placement order's reversal advances the parent's argument against terminating parental rights." (*Id.* at p. 238.)

Here, mother and father do not argue that reversing the juvenile court's order will bolster their case against the termination of their parental rights. They do not argue, for example, that they would have retained their parental rights if the minor were placed with relatives, notwithstanding the denial of reunification. (*See K.C., supra,* 52 Cal.4th at pp. 236-237 ["the decision to terminate or bypass reunification services ordinarily constitutes a sufficient basis for terminating parental rights"].) As in *K.C.,* the only persons with standing to appeal the juvenile court's denial of the section 388 petition are Betty C. and Ralph C., who have not filed an appeal. (*K.C.,* at p. 239.)

In her reply brief, mother attempts to distinguish *K.C.* by arguing that in that case the father did not contest termination of parental rights, thus relinquishing the interest in the child that could render him aggrieved by the juvenile court's declining to place the child with the grandparents. (*K.C., supra*, 52 Cal.4th at p. 238.) Here, mother did contest termination. Mother points out that the court in *K.C.* stated the placement of a child with relatives can, under certain circumstances, make the termination of parental rights unnecessary. (*Id*. at p. 237; see also *In re H.G.* (2006) 146 Cal.App.4th 1, 10; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1053-1054.) However, in *In re Isaiah* (2016) 5 Cal.App.5th 428, the court found such circumstances did not exist where the

relatives were seeking to adopt the child. (*Id.*at p. 436.) In this instance, Betty C. stated in the petition and Ralph C. testified at the hearing that the couple were seeking to adopt the minor. Moreover, mother had already failed to reunify with four other half-siblings of the minor, and Betty C. and Ralph C. had legal guardianship of Da. H., the minor's sister, whom they also intended to adopt. Thus, the record does not support any contention that placement of the minor with Betty C. and Ralph C. would have made termination of parental rights unnecessary. (*Ibid.*)

Even if the parents had standing, their contentions of trial court error fail. The juvenile court conducted a full hearing on Betty C.'s petition in November 2024. At the time of the hearing, the minor was almost 11 months old and had lived his entire life with the caregiver, Anne Z. (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855 ["The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her [or his] best interests"].) As social worker Jennifer Cruz testified, the minor was bonded to the caregiver and was thriving in her care. Conversely, Betty C.'s contact with the minor was minimal, and she had no relationship with him. Moving the minor would have been disruptive and not in his best interest. There was no abuse of discretion. (See *Alicia B. v. Superior Court of San Diego County* (2004) 116 Cal.App.4th 856, 863 [we review a juvenile court's custody placement order for abuse of discretion].)

II

*ICWA Compliance*

Father contends that a conditional reversal is required because the juvenile court's finding that ICWA did not apply was due to inadequate inquiries of the extended family and the Oklahoma tribes, and is therefore not based on substantial evidence. Mother joins in the father's argument. (Rule 8.200(a)(5).) We agree that the Agency's inquiry was inadequate and conditionally reverse the juvenile court's ICWA findings.

Congress enacted ICWA to protect Indian children and "to promote the stability

12

and security of Indian tribes and families" by formalizing federal policy and standards regarding the removal and placement of Indian children outside the family home. (25 U.S.C. § 1902; see *In re Dezi C.* (2024) 16 Cal.5th 1112, 1128-1129 (*Dezi C.*).)  The juvenile court and the social services agency have an affirmative and continuing duty to inquire whether a child who is subject to the proceedings is, or may be, an Indian child. (Rule 5.481(a); § 224.2, subd. (a).)  "Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child . . . ."  (§ 224.2, subd. (b)(2).)  An " 'extended family member' " includes "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent."  (§ 25 U.S.C. § 1903(2); see § 224.1, subd. (c) [adopting ICWA definition of " '[e]xtended family member' "].)

"This 'duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child.' "  (*Dezi C., supra*, 16 Cal.5th at p. 1132.)  "When the agency has 'reason to believe' that an Indian child is involved, further inquiry regarding the possible Indian status of the child is required.  (§ 224.2, subd. (e); see also rule 5.481(a)(4)."  (*Ibid*., fn. omitted.)  "If the inquiry establishes a reason to know an Indian child is involved, notice must be provided to the pertinent tribes.  (§ 224.3, subds. (a), (b); 25 U.S.C. § 1912(a).)"  (*Id*. at p. 1133.)

"We review claims of inadequate inquiry into a child's Native American ancestry for substantial evidence."  (*H.A. v. Superior Court of San Joaquin County* (2024) 101 Cal.App.5th 956, 961.)  "[T]he juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review."  (*Dezi C.,* 16 Cal.5th at p. 1141.) " 'On a well-developed record, the court has relatively broad discretion to determine

whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes.' " (*In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101-1102.)

The Agency's inquiry here was manifestly inadequate. After father stated his grandmother was a registered member of an unidentified Oklahoma tribe, the Agency essentially limited its inquiry to one-time conversations with father and Betty C. The Agency sent placement letters to father's sister Sa. H., wife V. H., and half-sibling Dal. H., informing them of a relative in the foster care system, but the letters are not in the record, and there is no indication that the Agency inquired about Native American affiliation.[6] The Agency's conversation on July 15, 2024, in which Betty C. stated no family member had Native American affiliation, appears to have been an afterthought. In April 2024, the Agency filed a declaration that the BIA had indicated from the information in the ICWA-030 notice that the minor was not an Indian child under ICWA. In a report filed on July 9, 2024, the Agency requested that the juvenile court find, based on the declaration, that ICWA did not apply. Thus, the Agency deemed its ICWA inquiry adequate before speaking with Betty C.

The ICWA-030 notice the Agency served on the BIA included information that

---

[6]     The Agency sent similar letters to a number of mother's relatives, which were equally inadequate to satisfy its duty of inquiry under ICWA, notwithstanding mother's denial of Indian heritage. (*H.A. v. Superior Court of San Joaquin County, supra*, 101 Cal.App.5th at p. 960 [agreeing with petitioner's contention that "although both parents completed ICWA-020 forms denying knowledge of any Native American ancestry, inquiry of relatives and family members about the minors' potential Indian heritage is necessary to meet the requirements of the ICWA"]; *In re Y.W.* (2021) 70 Cal.App.5th 542, 556 [a parent "does not need to assert he or she has Indian ancestry to show a child protective agency's failure to make an appropriate inquiry under ICWA and related law is prejudicial. . . . It is unreasonable to require a parent to make an affirmative representation of Indian ancestry where the Department's failure to conduct an adequate inquiry deprived the parent of the very knowledge needed to make such a claim"]; *In re Rylei* (2022) 81 Cal.App.5th 309, 321-322.)

Phoenix, Arizona, was the city of residence for a possibly living paternal grandmother. Yet the record does not indicate the Agency attempted to locate or interview her. (*In re Michael V.* (2016) 3 Cal.App.5th 225, 235 [inadequate inquiry where "[t]he Department made no effort to locate the children's maternal grandmother to interview her even though it was she who reportedly had the direct link to a tribe" and mother said grandmother "might be living in San Diego, thus giving the Department at least a starting place for its inquiry"]; see also *In re M.E.* (2022) 79 Cal.App.5th 73, 82.) Similarly, father identified four siblings that the Agency also did not contact to inquire about Native American affiliation. (*In re Michael V.,* at p. 235 [inquiry also inadequate because the county department failed to contact mother's siblings].)

The Agency's failure to inquire of father's sister, A. R., about possible Indian ancestry is inexplicable given the opportunities it had to do so. Betty C. stated in her section 388 petition that A. R. accompanied her to court hearings in this case and visits with the minor. A. R. was potentially an important source of information, since she actually lived in Oklahoma, suggesting a family connection to the state and the Indian tribes located there.

Father's inability to identify a tribe did not relieve the Agency of its affirmative obligation to attempt to contact and interview extended family members. (*In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 786 ["the use of a tribal name that does not correspond to that of a federally recognized tribe—or saying 'Indian' but providing no tribal name at all—does not, without more, relieve the child protective agency of its affirmative obligation to interview family members"]; *In re Michael V., supra*, 3 Cal.App.5th at pp. 235-236 [social worker's reported statement that mother's mother was a "full-blooded Indian" required the department to contact relatives to inquire about possible Indian ancestry].)

Section 224.2, subdivision (b), places the duty of inquiry, including that of extended family members, on the Agency, but section 224.2, subdivision (a), of the

statute provides that both the Agency and the juvenile court have an affirmative and continuing duty to inquire whether a child is or may be an Indian child. The juvenile court's inquiry into the minor's Native American affiliation in this instance consisted of a single colloquy with mother and father where she said, "No," and he responded, "I don't know" to the court's question whether they had Native American heritage. The juvenile court never asked the Agency what efforts it made to contact father's extended family members. The juvenile court should have ensured that the Agency had made an adequate inquiry under ICWA and California law before finding that ICWA did not apply. (§ 224.2, subd. (a); *H.A. v. Superior Court of San Joaquin County, supra*, 101 Cal.App.5th at pp. 965-966.)

## DISPOSITION

The orders terminating parental rights are conditionally reversed, and the matter is remanded for the limited purpose of complying with the inquiry and notice provisions of ICWA, as well as the requirements of sections 224.2 and 224.3 and the documentation provisions of rule 5.481(a)(5). If the juvenile court thereafter determines that a further inquiry was proper and adequate, due diligence was conducted, and ICWA does not apply, the orders shall be reinstated. However, if the juvenile court determines that ICWA applies, the juvenile court is ordered to conduct a new section 366.26 hearing and proceed in accordance with ICWA and the California implementing provisions.

     \s\     ,
Krause, J.

We concur:

    \s\    ,
Hull, Acting P.J.

    \s\    ,
Wiseman, J.*

---

\*  Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.